# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | No. 11 CR 346-2 |
| LUIS CONTRERAS, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Luis Contreras' (Contreras)

motion to suppress. For the reasons stated below, the motion is denied.


## BACKGROUND

The Government has alleged the following facts: On November 9, 2010, Drug

Enforcement Administration agents, assisted by Chicago Police Department officers

(collectively referred to as "Agents"), were conducting surveillance of Arturo Flores

(Flores) as part of a large scale drug investigation, and observed Defendant

Alejandro Soto (Soto) at Flores' residence. Agents followed Soto to various

locations and ultimately to Soto's residence. Agents continued surveillance on

Soto's residence on November 10, 2010, and Agents followed Soto as he left his

residence. Agents observed Soto travel a block from his residence, exit his vehicle

and place two large trash bags into a dumpster (Dumpster). Agents then searched the

bags in the Dumpster and found latex gloves, coffee grounds, and other items, which appeared to be drug packaging materials, and which were positively identified at the scene by a canine unit as containing narcotics.

Agents continued to follow Soto, and later that day observed Soto proceed to the residence of Contreras (Residence) and enter the garage (Garage) of the Residence. The Agents continued to conduct surveillance of the Residence. According to the Agents, after ten to fifteen minutes of surveillance, the door to the Garage opened. After observing Contreras and Soto inside the Garage for several minutes and observing narcotics in plain view, the Agents approached the Garage and arrested Contreras and Soto. Thereafter, Contreras consented to a search of the Residence.

Contreras now moves to bar any evidence recovered from the Garage or the Residence and any statements made by Contreras on November 10, 2010. Initially, Contreras filed an affidavit, and based on that affidavit, the court scheduled an evidentiary hearing on the motion to suppress. On April 26, 2012, and May 5, 2012, the court conducted a suppression hearing (Hearing), and at the Hearing both sides were given an opportunity to present witnesses and evidence. At the hearing, Contreras did not testify.

## DISCUSSION

Contreras argues that the search of his Garage and Residence were conducted in violation of the Fourth Amendment. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against

unreasonable searches and seizures. . . ."  U.S. Const. amend. IV; *see also, e.g.,*
*United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011)(quoting U.S. Const.
amend. IV).  In assessing whether an individual's Fourth Amendment rights were
violated the court must determine: "(1) whether a search or seizure actually occurred;
and (2) if so, whether the search or seizure was unreasonable."  *Id.*

I.  Credibility of Witnesses

Both sides were given an opportunity to present witnesses at the Hearing.  The
Government presented as witnesses Agent Todd Zimmerman, Agent Raphael
Mitchem (Agent Mitchem), Agent Clark Eichman (Agent Eichman), and Agent
Rubin Briones.  Contreras presented as a witness Christina Burke (Burke),
Contreras' sister-in-law, who was at the Residence at the time of the incident.  Based
upon the content of the testimony of the Government's witnesses and the court's
observation of their demeanor, the court concludes that the Government's witnesses
were entirely credible.  To the extent that Contreras pointed to inconsistencies in
prior statements and testimony by Agent Mitchem, Agent Mitchem adequately and
credibly explained why he made the prior statements and gave the prior testimony.
In addition, the testimony of the other Agents fully corroborates Agent Mitchem's
testimony regarding the events that occurred.  In addition, the court finds that
Burke's testimony was not entirely credible and that the testimony of Burke relating
to her whereabouts during the time of the events did not meaningfully impact upon
the issue of whether the search of the Garage violated the Fourth Amendment.

Contreras argues that the initial search in the Garage without a search warrant was improper.  The Government argues that the Agents could lawfully approach the open Garage without first obtaining a search warrant.  Law enforcement officers may enter a private property without a warrant on the "part of private property that is open to visitors or delivery people."  *United States v. LePage*, 477 F.3d 485, 488 (7th Cir. 2007); *see also, e.g., United States v. Sandoval-Vasquez* , 435 F.3d 739, 742-43 (7th Cir. 2006).  A Fourth Amendment claim that is premised on a challenge to a warrantless seizure of evidence cannot succeed in regard to items that "were validly seized under the 'plain-view' doctrine."  *Curlin*, 638 F.3d at 565.  Under the plain view doctrine, a warrantless seizure does not violate the Fourth Amendment as long as: (1) the officer executing the seizure did not "violate[] the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," (2) "the incriminating character of the evidence in plain view [is] immediately apparent," and (3) the officer had  "a lawful right of access to the object itself."  *Id.*  The incriminating nature of an object is deemed to be "immediately apparent if, under the circumstances, the officer has probable cause to believe that the item is linked to criminal activity."  *Id.*

In the instant action, the Government has shown by credible evidence that the Agents did not violate the Fourth Amendment when they approached the open Garage.  The Agents testified that they had observed Soto discard drug packaging prior to the time they established surveillance on the Residence.  The Agents also testified that a short time after establishing surveillance on the Residence, the Garage

door opened.  Agent Mitchem testified that he had an unobstructed view inside the Garage and that he used binoculars to see what was happening inside the Garage. Agent Mitchem also testified that he saw Contreras and Soto either shake hands or make a hand-to-hand exchange.  In addition, Agent Mitchem testified that Contreras opened the rear hatchback of his vehicle and that Soto opened the rear hatch of his van, both of which were parked in the Garage.  According to Agent Mitchem, Soto retrieved an orange shoe box from inside the van.  In addition, Agent Mitchem testified that while Soto was carrying the shoe box, it fell to the ground and that one or two wrapped packages resembling illegal drugs fell out of the shoe box.  Agent Mitchem testified that after the shoe box fell, Soto picked it up, turned his back away from the open Garage door, and carried a tan plastic bag containing the shoe box toward the other vehicle.  Agent Mitchem testified that he was communicating what he observed over the radio, and that, at that point, an instruction was given to enter the Garage.  Agent Mitchem further testified that when he drove up to the Garage, Soto dropped the plastic bag containing the shoe box.

Agent Eichman testified that he entered the Garage fifteen to twenty seconds after Agent Mitchem, and that at the direction of Agent Mitchem, he arrested Soto. Agent Eichman testified that he then saw the plastic bag containing the shoe box on the floor of the Garage.  Agent Eichman also testified that at no point did he see Agent Mitchem or any other Agent search the Garage or the vehicles located inside the Garage.  Both Agent Mitchem and Agent Eichman testified that the shoe box had silver duct tape on it, and that neither was responsible for the duct tape being cut open.

In this case, once the Agents discovered the packaging materials that appeared to relate to illegal drugs and once Officer Mitchem observed what he believed to be narcotics in plain view in the open Garage, the Agents had probable cause to believe that the materials were linked to criminal activity. The Agents could then lawfully enter the open Garage to investigate further the apparent criminal activity. Therefore, the Government has shown, by a preponderance of the evidence, that the Agents did not need to obtain a search warrant and that their search did not violate the Fourth Amendment. Based on the above, the court need not address whether exigent circumstances existed to justify the search of the Garage.

III.  Written Consent

Contreras also argues that the written consent provided was not properly obtained by the Agents. Although counsel for Contreras indicated orally at the hearing that Contreras was not challenging the validity of the written consent, Contreras' written filing references alleged coercion at the time of the signing of the written consent. The Agents testified that immediately after his arrest, Contreras offered to cooperate with the Agents. The Agents also testified that shortly after his arrest, Contreras was taken into the Residence by Drug Enforcement Administration Agent Terry Glynn, his handcuffs were removed, he was given warnings consistent with *Miranda v. Arizona*, 384 U.S. 436 (1966), and after receiving *Miranda* warnings, he consented to a search of the Residence and answered questions regarding his involvement in the narcotics operation and the contraband that was located inside the Residence. The Government thus presented credible evidence that

showed that Contreras was not coerced in agreeing to the search, that Contreras readily cooperated with the Agents, and that Agents located items, including illegal drugs, guns, and cash, in the Residence where Contreras directed the Agents to look. The evidence presented at the Hearing shows that the written consent given by Contreras to search the Residence was validly obtained. Contreras has not shown that the written consent was obtained by coercion or any unlawful means, nor that it was the product of an illegal search. After considering all of the evidence, including Contreras' affidavit and the testimony of the witnesses, Contreras' motion to suppress is denied.


## CONCLUSION

Based on the foregoing analysis, the court denies Contreras' motion to suppress.

Samuel Der-Yeghiayan
United States District Court Judge

Dated:   June 26, 2012